# EXHIBIT D

# FEBRUARY 18, 2016 FREE PRESS LETTER IN RESPONSE TO ORION TOWNSHIP DEMAND

Detroit Free Press
A GANNETT COMPANY
www.freep.com

160 W. Fort Street, Detroit MI 48226 | phone: 313-749-9979 | fax: 313-749-9989 | hfink@freepress.com

**Herschel Fink**
Legal Counsel

February 18, 2016

Daniel J. Kelly, Esq.
Giarmarco, Mullins & Horton, P.C.
Tenth Floor Columbia Center
101 West Big Beaver Road
Troy, MI 48084-5280

***Re: Detroit Free Press Select Complaint/Orion Township "Littering" Ordinance No. 136***

Dear Mr. Kelly:

I am legal counsel at the Detroit Free Press, and this is in further response to your letter on behalf of your client the Charter Township of Orion, dated February 4, 2016, which was addressed generically to "The Detroit Free Press," and was ultimately forwarded to me on February 16, 2016. Your letter claims that the township has "received complaints from private property owners" about "unrequested and undesired newspapers," which you claim constitute "litter" under a township ordinance, which you say defines litter as "rubbish, refuse, waste material, garbage, offal, paper, glass, cans, bottles, trash, or other foreign substances or a vehicle that is considered abandoned under Section 252a of the Michigan vehicle code, 1949 PA 300, MCL 257.252a." Your letter further threatens that if the Free Press continues to exercise its First Amendment protected activities in Orion Township, "continued violation of this Ordinance may cause the issuance of a civil infraction; which, if found responsible, could lead to a Court imposition of fines, penalties and costs," and that if "delivery of the above referenced newspaper/flyers" does not cease by February 28, 2016, "similar activities subsequent to this deadline will be turned over to the Township's Code Enforcement Officers for purposes of investigation and enforcement of Ordinance No. 136-Littering Ordinance."

The purpose of my response is two-fold: First, to explain why the delivery of newspapers – even if unsolicited – does not constitute "litter," and is a fully First Amendment protected activity. Second, that township interference with the delivery by the Free Press of its newspapers may constitute an unconstitutional prior restraint, which may open the township – and its elected and appointed officials – to a civil rights lawsuit in U.S. District Court pursuant to 42 USC 1983, entitling the Free Press to injunctive relief, damages and attorney fees. Because of the serious and costly implications of such a lawsuit on the township, I am copying its elected officials so that they are on notice of the consequences of the ill-advised action threatened in your letter, and can, in the words of the U.S. Supreme Court, "steer far wide of the unlawful zone." *New York Times v. Sullivan,* 376 U.S. 254, 279 (1964).

***Newspapers Cannot Be Termed "Litter":***  If you do not know, Free Press Sunday Select, which I assume is the subject of your letter, is a weekly free publication containing both editorial matter and advertising from the daily newspaper.  Without question, it is First Amendment protected expressive material, and cannot be banned or enjoined from distribution by government.

Of course, the Free Press does not want the added expense of sending newspapers to those who don't wish to receive them, and so we take steps to be certain that we only deliver to those who have indicated a desire to receive them.  We also respond to *individual* requests from readers who no longer wish to receive papers.  What we do not do is allow others, such as an association, or certainly, as in this case, a governmental body to dictate a blanket demand to stop distribution to thousands of families, most of whom do wish to receive them.

It is also self-evident that government may not interfere with, nor penalize, the dissemination of constitutionally protected, expressive material by labeling it "litter" or "trash."  It is also self-evident that the Free Press edition in question is such constitutionally protected expression.  Because it contains both news and information drawn from the Free Press, as well as advertising, it must be categorized as non-commercial speech, entitled to the full protection of the First and Fourteenth Amendments to the United States Constitution, as well as art 1, sec 5 of the 1963 Michigan Constitution.  See *Edenfield v. Fane, 123 L. Ed. 2d 543,   U.S.   , 113 S.Ct. 1792, 1798 (1993); Ad World, Inc. v. Township of Doyleston, 672 F.2d 1136, 1139-40 (3rd Cir. 1982).*   Also, see *Organization for a Better Austin v. Keefe, 402 U.S. 415 (1971).*

Although there appears to be no Michigan appellate decision on point with the facts of the "complaints" cited in your letter – perhaps because it is so self-evident -- the issue has been decided on virtually identical facts and law in other jurisdictions.  A leading decision is by the Supreme Court of Wyoming in *Miller v. City of Laramie, 880 P.2d 594 (1994 Wyo.).*

In *Miller,* the Court described the defendant as "the publisher of a free weekly newspaper.  Most of the copies of the newspaper were delivered door to door by depositing the paper on the porches of residences and buildings.  In some instances, the papers came to be on the lawns, driveways or sidewalks of local residences.  Defendant did not solicit subscriptions nor did he seek the consent of residents before making delivery.  Defendant was convicted of violating a city litter ordinance and fined $210 by the municipal court." *id at 594.*  The Wyoming Supreme Court reversed the conviction, finding that application of the litter ordnance to the distribution of a newspaper violated the defendant's right to free speech under both the federal and state constitutions.

The Court continued that, "We hold that the record here readily demonstrates that *The Adviser* burdened the City of Laramie in an extraordinarily minor way and that, likewise, the burden placed on the citizens of Laramie and private property in that city was exceedingly trivial.  We are confident that the vast majority of citizens will agree that such insignificant and slight burdens are a small price to pay for a free society – *and then hasten to add that even a solid majority may not extend its prohibitions in such a manner as to violate the United States or the Wyoming Constitutions.*  Therefore, We reverse." *Id at 595, emphasis added.*

The Court also observed that, even though it had decided the case on Constitutional grounds, the definition of "litter" in the Laramie ordinance – almost identical to the Orion Township ordinance you quote in your letter – simply could not apply to a newspaper containing a varied content of

information and advertising. ("We also suggest that the Laramie ordinance, on its face, demonstrates a legislative intent that a newspaper like *The Adviser* is not litter, litter being defined as 'trash, debris, rubbish, refuse, garbage or junk.' But that is unnecessary to our decision here." *Id at 598.* A concurring opinion was based upon the same conclusion that the definition of "litter" in the ordinance "clearly describes anything which has been discarded as being of no value. There is a total lack of proof that *The Adviser* had been discarded as being of no value. The proof was to the contrary." *Id at 599.* A copy of the Miller opinion is attached.

***Township Interference Would Be Unconstitutional:*** As a lawyer who has represented news organizations and others in the defense of First Amendment rights for over four decades, you can safely assume that there are few free speech issues that I haven't encountered. One case that seems instructive and directly on point involved my representation of rap music icon Dr. Dre (Andre Young), whose back-to-back 2000 concerts in Detroit and Auburn Hills were interfered with by officials and police, who claimed that the concerts were obscene, and might inspire violence.

Within hours following Detroit Police censorship of the Detroit concert, I went into federal court to seek an injunction against any similar interference by Auburn Hills that night. You may find U.S. District Judge Nancy Edmunds' attached Order Granting Preliminary Injunction and bench opinion instructive. Judge Edmunds found that interference with a concert performance, which Auburn Hills officials had argued would be obscene, and might inspire violence, was a "prior restraint" on protected speech. In fact, she held: "It's nothing but, it's nothing but the most blatant violation of the First Amendment…." (Bench Opinion, p. 22) If such a performance was found to be protected expression, consider what a federal court might say about Orion Township's threatened interference with delivery of newspapers.

Not only did I obtain the immediate preliminary injunction against Auburn Hills interfering with that night's concert, but because Auburn Hills went ahead and ticketed Dr. Dre after his performance, I filed separate civil rights lawsuits pursuant to 42 USC 1983 against both Auburn Hills and the City of Detroit for its earlier interference. I am also attaching just a few pages from the Detroit complaint (I can't immediately locate the Auburn Hills one) to give you a flavor of where this present matter might go, should Orion Township follow through on the threat you made in your letter. Both suits were very quickly settled for public apologies, First Amendment "sensitivity training" for city officials, and $50,000 in attorney fees (at 2000 billing rates). I chose not to seek damages that time.

Please know that the Free Press is not looking for a battle over its right to continue distributing its protected news products in Orion Township. At the same time, we are fully prepared to take all necessary legal action to do so. Should you have any questions about this, feel free to contact me.

Very truly yours,

Herschel P. Fink
Legal Counsel
Detroit Free Press, Inc.

Positive
As of: January 29, 2015 3:51 PM EST

# Miller v. City of Laramie

Supreme Court of Wyoming

September 7, 1994, Decided

No. 93-182

**Reporter**
880 P.2d 594; 1994 Wyo. LEXIS 99; 22 Media L. Rep. 2302

GERALD R. MILLER, Petitioner, v. THE CITY OF LARAMIE, Respondent.

## Case Summary

### Procedural Posture

Defendant sought review of a decision of the district court (Wyoming), which upheld a decision of the municipal court convicting defendant of the crime of littering in violation of a city ordinance for distributing his free newspaper by house-to-house delivery.

### Overview

Defendant was the publisher of a free weekly newspaper. Most of the copies of the newspaper were delivered door to door by depositing the paper on the porches of residences and buildings. In some instances, the papers came to be on the lawns, driveways or sidewalks of local residences. Defendant did not solicit subscriptions nor did he seek the consent of residents before making delivery. Defendant was convicted of violating a city litter ordinance and fined $ 210 by the municipal court. The district court upheld the conviction. The court reversed defendant's conviction and found that the application of the litter ordinance to prevent defendant from distributing his newspaper violated defendant's right to free speech. The court found that that the city failed to carry its burden of proving that application of the litter ordinance in this way was a proper time, place, and manner restriction on defendant's right to free speech. The court also found that any burden imposed upon the city in cleaning and caring for the streets as an indirect consequence of defendant's distribution of his newspaper resulted from the constitutional protection of the freedom of speech and press.

### Outcome

The court reversed defendant's conviction for littering and remanded to the district court with directions that the district court further remand to the municipal court for vacation of the convictions and dismissal of the littering charges.

**Counsel:** [**1] Representing Petitioner: Christopher H. Hawks, Director, Lawyers and Advocates for Wyoming, Jackson, WY.

Representing Respondent: Douglas K. Bryant of Corthell & King, Laramie, WY.

**Judges:** Before GOLDEN, C.J., and THOMAS, CARDINE *, MACY, and TAYLOR, JJ. CARDINE, J., Ret., delivered the opinion of the court. MACY, J., filed an opinion specially concurring. GOLDEN, C.J., filed a dissenting opinion.

**Opinion by:** CARDINE

## Opinion

[*595] *Original Proceeding*

*Petition for Writ of Review*

CARDINE, Justice, Retired.

We granted a petition for review to consider Gerald R. Miller's claim that his right of free speech, as guaranteed by *Art. 1, § 20 of the Wyoming Constitution* and the ***First Amendment*** to the United States Constitution was abridged by the City of Laramie's ***littering*** ordinance. Petitioner Miller was convicted of the crime of ***littering*** for distributing his free ***newspaper***, *The Adviser,* by house-to-house delivery.

We hold that the record here readily demonstrates that *The Adviser* burdened the City of Laramie in an extraordinarily minor way and that, likewise, the burden placed on the citizens of Laramie and private property in that city was exceedingly trivial. We are confident [**2] that the vast

* Retired July 6, 1994.

majority of citizens will agree that such insignificant and slight burdens are a small price to pay for a free society -- and then hasten to add that even a solid majority may not extend its prohibitions in such a manner as to violate the United States or the Wyoming Constitutions. Therefore,

We reverse.

Miller articulates these grounds for appellate review:

> A. The Petitioner's actions and conduct in causing copies of *"The Adviser"* to be placed on the front porches, in the yards and on the grounds of the homes of several Laramie residents is conduct entitled to protection under the ***First Amendment*** of the United States Constitution and Article One Section 20 of the Wyoming Constitution.
>
> > (i) The City of Laramie's interest in preventing the visual blight caused by the unrequested door-to-door distribution of the Petitioner's free weekly ***newspaper*** does not outweigh the defendant's fundamental rights of free speech, press and circulation.
>
> B. Prosecuting Mr. Miller for ***littering*** is not a reasonable time, place and manner restriction on Mr. Miller's conduct because Mr. Miller did not exercise his right of free speech in a public forum.
>
> > (i) The District Court's [**3] reliance on *Schenck v. The United States [249 U.S. 47, 39 S.Ct. 247, 63 L. Ed. 470 (1919)]* to affirm the decision of the Municipal Court's conviction of Mr. Miller was a misapplication of the law and should be disregarded.
>
> C. Prosecuting the publisher of a free weekly ***newspaper*** for ***littering*** violates his rights of equal protection when his paper is delivered consistent with other area papers with the exception that it is done so without subscription.

The City of Laramie abbreviates the controversy with this contention:

> Whether application of the City of Laramie's ***litter*** ordinance to the unrequested placement of copies of *The Adviser* upon private residential properties violates the [Petitioner's] constitutional rights as to speech and press.

The *First Amendment of the United States Constitution* provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

*Article 1, § 20 of the Wyoming* [**4] Constitution provides:

> [*596] Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right; and in all trials for libel, both civil and criminal, the truth, when published with good intent and [for] justifiable ends, shall be a sufficient defense, the jury having the right to determine the facts and the law, under direction of the court.

The City of Laramie Municipal Ordinance § 8.20.030 provides:

> It is unlawful for any person to throw, discard, place or deposit, or cause to be thrown, discarded, placed or deposited, litter in any manner or amount on any public or private property within the corporate limits of the city except in containers or areas lawfully provided therefor.

And Ordinance § 8.20.010(A) defining litter provides:

> A. "Litter" is any quantity of uncontainerized paper, metal, plastic, glass, animal feces, or miscellaneous solid waste which may be classed as trash, debris, rubbish, refuse, garbage or junk.

Miller distributed a free weekly newspaper, *The Adviser,* in Laramie. Approximately 6,000 copies of the newspaper were delivered door to door by depositing the paper on the porches of residences and buildings. [**5] In some instances, the papers came to be on the lawns, driveways or sidewalks of Laramie residences. An additional 1,000 copies were distributed by other means such as news racks. Miller did not solicit subscriptions nor did he seek the consent of residents before making delivery. *The Adviser* contained community news; sources of free information on such things as recipes, voice programming, parenting, and healthful sleep; sports stories; television programming for the coming week; a crossword puzzle; horoscope column; gossip column; a children's page; want adds; and numerous advertisements.

Our recital of facts herein is from the exhibits, stipulated statement of evidence by the parties, and the record in this case. The audiotape transcript of testimony was erased by the clerk of the municipal court after the record was returned following appeal to the district court. The erasure occurred during the appeal process. Our choices at this point are to reverse and remand for new trial for lack of a record, through no fault of petitioner, or decide this appeal on the record before us. We think the exhibits, admissions, stipulation of the parties and record are sufficient for our decision [**6] in this appeal.

By information filed on February 1, 1993, Miller was charged with seven counts of littering based upon complaints made by seven Laramie residents. The complaints were tried before a municipal judge on March 22, 1993. Miller was found guilty on four counts and not guilty on one count (apparently because the testimony of that witness was to the effect that the paper was found on his porch; all others testified that the papers were found on their sidewalks, driveways or in their yards). The complaints which alleged littering on the same day were consolidated, resulting in the disposition of the other two counts. Miller was fined $ 50.00 per count and assessed $ 10.00 costs, for a total fine of $ 210.00.

A timely notice of appeal was filed, and the convictions were reviewed by the district court. Miller's only defense throughout trial, on appeal, and in this petition for writ of review is that the littering statute, as applied to the delivery of his newspaper, was a violation of his constitutional right of free speech and equal protection. The district court affirmed the convictions, finding that the restrictions created by the littering ordinance were reasonable time, [**7] place and manner restrictions on the right of free speech.

Miller's petition for writ of review in this court was granted September 29, 1993. The parties have agreed that the newspaper in question contained news, advertising and other information; and no question is directly posed as to whether it was commercial or noncommercial speech. It is a necessary first step in our analysis, however, to expressly acknowledge that, because of its varied content, the newspaper must be categorized as noncommercial. See *Ad World, Inc. v. Township of Doylestown, 672 F.2d 1136, 1139-40 (3rd Cir. 1982)*. Because it is noncommercial speech, it is entitled to the full protection of the *First* and [*597] *Fourteenth Amendments of the United States Constitution*, as well as *Art. 1, § 20 of the Wyoming Constitution*. See *Edenfield v. Fane, 123 L. Ed. 2d 543, __ U.S. __, 113 S.Ct. 1792, 1798 (1993)*; *Ad World, 672 F.2d at 1140*. Purely commercial speech is tested against a more relaxed standard. *Edenfield.*

Miller has maintained from the beginning that the Laramie ordinance was unconstitutional as applied [**8] to the distribution of his newspaper. The general rule is that one who alleges unconstitutionality bears a heavy burden and must clearly and exactly show the unconstitutionality beyond any reasonable doubt. *Pauling v. Pauling, 837 P.2d 1073, 1076 (Wyo. 1992)*. However, that rule does not apply where a citizen's fundamental constitutional right, such as free speech, is involved. The strong presumptions in favor of constitutionality are inverted, the burden then is on the governmental entity to justify the validity of the ordinance, and this Court has a duty to declare legislative enactments invalid if they transgress that constitutional provision. See *Witzenburger v. State ex rel. Wyoming Community Dev. Auth., 575 P.2d 1100, 1114 (Wyo. 1978)*, reh'g denied *577 P.2d 1386*. The rule we apply under the circumstances of this case is:

> Where rights, privileges, and immunities of the citizen are involved, the usual strong presumption in favor of constitutionality does not apply, and this rule is applicable to First Amendment rights. This is true in situations involving the right of freedom of expression [**9] or thought, or of speech, or association, or of the press, or of religion. Under some authority, the usual presumption in favor of constitutionality is merely weaker where the statute arguably inhibits fundamental rights.
>
> Indeed, it is the rule that where the governmental action impinges on a fundamental constitutional right the usual presumption is inverted, and the presumption, sometimes characterized as heavy, is against the constitutionality of a statute or governmental action involving a right explicitly or implicitly secured by the Constitution, including a right secured by the First Amendment, such as freedom of speech or expression. Moreover, every reasonable presumption against waiver of fundamental constitutional rights is indulged by the courts and they do not presume acquiescence in the loss of fundamental rights. In view of the inversion of the usual presumption of constitutionality, the burden is on the state of justifying the validity of the statute or other governmental action, as by a demonstration that the statute serves a compelling governmental interest.

(footnotes omitted) 16 C.J.S. Constitutional Law, § 106a (1984); and see *Parrish v. Lamm, 758 P.2d 1356 (Colo. 1988)*; [**10] *Village of Hoffman Estates v. Flipside,*

Hoffman Estates, Inc., 455 U.S. 489, 102 S.Ct. 1186, 71 L. Ed. 2d 362 (1982); Papachristou v. City of Jacksonville, 405 U.S. 156, 92 S.Ct. 839, 31 L. Ed. 2d 110 (1972); Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L. Ed. 2d 222 (1972). Thus, we are duty bound to strictly scrutinize the ordinance in the light of the preeminent role played by the First Amendment in our free society.

The City of Laramie directs our attention to the fact that its littering ordinance prohibits all littering, without regard to whether it is commercial or noncommercial, and without regard to whether it relates to matters of politics, religion or whatever. In other words, not only does the ordinance affect (prohibit) the delivery of *The Adviser,* but it also prohibits the depositing of litter which contains a religious, political, or any other sort of message. Thus, the question posed boils down to whether Laramie may place a complete ban on speech, a form of prior restraint, [**11] if that speech is in a form which may eventually be viewed as litter.

The record from the trial in Laramie Municipal Court does not sustain Laramie's argument that the ordinance is merely a ban on litter in any form which, therefore, easily passes constitutional muster. The City of Laramie had an onerous burden of demonstrating clearly and precisely that the ordinance is, in fact, applied in a nondiscriminatory manner. From this record, we discern that based on a mere handful (perhaps not more than a dozen out of some 7,000 papers distributed weekly) of citizen complaints that [*598] the newspaper was found in their yards, Miller was prosecuted for littering. There was no evidence adduced by Laramie that the ordinance is generally enforced, or at least often enforced. The record makes no suggestion that the ordinance is generally enforced against those who "litter" in a more traditional sense of that "crime" (see W.S. 6-3-204 (1988)). Moreover, the proof of littering in this instance was based solely upon rather gossamer circumstances, *e.g.,* that the newspaper was found in the yard (was it placed there by Miller, or did it blow there, or did a dog drag it there, etc.); that it was found [**12] on the sidewalk (again without any demonstration of how it arrived at that location -- might a disgruntled citizen carry it to the street and deposit it there and assert that the publisher is consequently responsible? -- Is this publisher any more responsible for where his newspaper was found than is a fast food restaurant for waste products that bear its logo?). As noted above, the burden must fall on Laramie to demonstrate that the restrictions imposed on speech by its littering ordinance are narrowly tailored to achieve the goal of reducing litter and that any time, place and manner restrictions that might affect Miller and those similarly situated are guardedly balanced in a constitutional sense.

Counsel for the City of Laramie maintain that Miller should not be entitled to have his acts of littering be regarded as protected speech. Quite the contrary is the case: Miller is entitled to have his right of free speech not curtailed by an ordinance designed solely to prevent littering:

> We are of [the] opinion that the purpose to keep the streets clean and of good appearance is insufficient to justify an ordinance which prohibits a person rightfully on a public street from handing [**13] literature to one willing to receive it. Any burden imposed upon the city authorities in cleaning and caring for the streets as an indirect consequence of such distribution results from the constitutional protection of the freedom of speech and press.

Schneider v. New Jersey, 308 U.S. 147, 162, 60 S.Ct. 146, 151, 84 L. Ed. 155 (1939); and see *McQuillin Mun. Corp.* § 24.389 (3rd ed. 1989). In this case, though clear proof is absent, it would appear from the few complaints that 6,990 persons may have been willing to receive *The Adviser.*

The parties had stipulated that the Laramie policeman testified that petitioner's newspaper, as it lay before him in the courtroom, was not liner. Apparently, according to Laramie, it became litter when it was found on the sidewalk and petitioner was then guilty of a crime without any proof that petitioner was responsible for the newspaper being on the sidewalk -- surely a questionable result. We also suggest that the Laramie ordinance, on its face, demonstrates a legislative intent that a newspaper like *The Adviser* is not litter, litter being defined as "trash, debris, rubbish, [**14] refuse, garbage or junk." But that is unnecessary to our decision here.

We hold that Laramie may not ban all distribution of noncommercial speech materials which it views as litter under its wide-sweeping ordinance. It may place reasonable restrictions on such distributions so long as they do not have the effect of squelching legitimate speech which is protected by the constitution and so long as Laramie can demonstrate that other substantial means of communicating such speech are meaningfully available, including economic feasibility. See *e.g.,* Distribution Systems of America, Inc. v. Village of Old Westbury, 785 F.Supp. 347 (E.D.N.Y. 1992); *Project 80's,* Inc. v. City of Pocatello, 942 F.2d 635 (9th Cir. 1991). Balancing the constitutional right of free speech with the evidence adduced by Laramie to sustain the validity of its ordinance, we find that the minor burden of receiving Miller's paper was indisputedly outweighed by his right of free speech and that the justification for restrictions upon distribution (finding a few papers in a driveway, on a

sidewalk or street) which resulted in violation of the ordinance were [**15] not reasonable.

We hold that the ordinance, as applied to Miller, violated constitutional guarantees. Hence, we remand with directions that the district court further remand to the municipal court for vacation of the convictions and dismissal of the littering charges.

Reversed and remanded with directions that the convictions for littering be vacated [*599] and that the charges against Miller be dismissed.

**Concur by:** MACY

## Concur

MACY, Justice, specially concurring.

I concur in the result reached by the majority but for a different reason. If it were not necessary to dance through the "litter" of cases in deciding whether the ordinance is or is not constitutional, I would join in the dissent of Chief Justice Golden. I do not, however, think that it is necessary to invoke the Constitution to decide this case. *Pisano v. Shillinger, 835 P.2d 1136, 1138 (Wyo. 1992)*; *Wheeler v. Parker Drilling Company, 803 P.2d 1379, 1383 n.1 (Wyo. 1991)*.

The ordinance in question states that litter includes uncontainerized paper which may be classified as being trash, debris, rubbish, refuse, garbage, or junk. Those words clearly describe anything which has been discarded [**16] as being of no value. There is a total lack of proof that *The Adviser* had been discarded as being of no value. The proof was to the contrary.

**Dissent by:** GOLDEN

## Dissent

GOLDEN, Justice, dissenting.

As indicated by this court's previous freedom of speech and press decisions, there can be little doubt of our relentless concern to avoid abridgments to freedom of expression. But this trivial city ordinance hardly qualifies as a menace to those revered freedoms. It neither suppresses content nor prohibits distribution and, as applied by the trial court, cannot even be said to prohibit THE ADVISOR from being distributed door to door except when that distribution is so careless as to be littering. Such innocuous regulation of littering is not a speech or press violation and I must dissent.

The record is clear that Laramie punished Mr. Miller for those distributions of his newspaper that were carelessly strewn about neighborhoods. [1] The record is also clear that Mr. Miller was acquitted in those instances where the newspaper was placed on the porch of the household. This distinction indicates that, as the record stands, Laramie is neither making a content-based determination of what newspapers shall or shall [**17] not be distributed nor unreasonably restricting distribution, but is controlling "litter.

Appellant contends that the constitutional violations occur when the ordinance is applied to his newspaper distribution and sweepingly states that every law which impinges on free expression is to be strictly scrutinized. In other words, any limitation on freedom of expression is unconstitutional; quite candidly, this is a banal argument routinely rejected by the United States Supreme Court since the 1943 case of *Martin v. Struthers*, when it recognized that "the peace, good order and comfort of the community may imperatively require regulation of the time, place and manner of distribution." *Martin, 319 U.S. 141, 143, 63 S. Ct. 862, 863, 87 L. Ed. 1313, (1943)*. Appellant attempts to assert the ordinance violates *WYO. CONST. art. 1, § 20*, but finds it of such insignificance that his only reference to the provision is as *"passim"* in his table of contents. Accordingly, appellant provides no analysis, authority, or cogent argument concerning the state constitutional provision's application to the issues. Instead, appellant [**18] relies on federal case law and does not distinguish between the two provisions of the two constitutions.

This court has previously admonished Wyoming lawyers that it is imperative they properly brief this court on relevant state constitutional questions. *Dworkin v. L.F.P., Inc. 839 P.2d 903, 909 (Wyo. 1992)*. "To develop and prove [his] position with respect to the state constitutional provision, [Miller], and any other similarly situated litigant, must use 'a precise, analytically sound approach.' Counsel must provide this court with proper arguments and briefs to ensure the future growth of this important area of law." *Dworkin 839 P.2d at 909* (quoting Robert F. Utter, *Advancing State Constitutions in Court, TRIAL*, Oct. 1991, at 45). "Recourse to the Wyoming Constitution as an independent source for recognizing and protecting the individual rights of our citizens [*600] must spring from a process that is

[1] The newspapers were found in yards, driveways, snowdrifts, the street, and a window well.

articulable, reasonable, and reasoned." Saldana v. State, 846 P.2d 604, 621 (Wyo. 1993) (quoting State v. Gunwall, 106 Wash. 2d 54, 720 P.2d 808, 813 (Wash. 1986)) [**19] (Golden, J., concurring). Appellant's failure to properly brief the state constitutional arguments limits our review to his federal constitutional arguments.

The United States Supreme Court's modern day jurisprudence requires that in noncommercial speech cases:

> The normal inquiry that our doctrine dictates is, first, to determine whether a regulation is content-based or content-neutral, and then based on the answer to that question, to apply the proper level of scrutiny.

Ladue v. Gilleo, ___ U.S. ___, 114 S. Ct. 2038, 2047, 129 L. Ed.2d 36, 50 (1994) (O'Connor, J., concurring).

If a regulation is content-neutral, the United States Supreme Court has upheld reasonable "time, place, or manner" restrictions when justified without reference to the content of speech. Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 2753, 105 L. Ed.2d 661, 675 (1989); [**20] *Martin,* 319 U.S. at 143, 63 S. Ct. at 863, 87 L. Ed. at ___.

Although THE ADVISOR is primarily comprised of commercial speech, I agree with the majority's initial classification of THE ADVISOR as noncommercial speech and concur that it is entitled to full first amendment protection. *See* Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 100 S. Ct. 2343, 65 L. Ed.2d 341 (1980). Although the majority makes no determination of the ordinance's effect upon free speech, that is, whether it is content-based or content-neutral, the language and level of scrutiny employed forces an assumption that the majority must have concluded it is a content-based regulation. I find no basis for such a conclusion.

I am of the opinion that the ordinance is constitutionally valid as a reasonable, time, place and manner regulation. The United States Supreme Court has upheld justified "time, place and manner" regulations which are narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication of the [**21] information. *See* Ward, 491 U.S. at 791, 109 S. Ct. at 2753, 105 L. Ed.2d at 675. Laramie justifies the ordinance as a means to achieve its significant interest in maintaining clean streets. The United States Supreme Court has stated that cities have a legitimate interest in clean streets. *See* Schneider v. State, 308 U.S. 147, 162, 60 S. Ct. 146, 151, 84 L. Ed. 155, 165, (1939); *Martin,* 319 U.S. at 143, 63 S. Ct. at 863, 87 L. Ed. at ___.

The Court specifically stated in *Schneider* that the guarantee of freedom of speech or of the press does not "deprive a municipality of power to enact regulations against throwing literature broadcast in the streets. Prohibition of such conduct would not abridge the constitutional liberty since such activity bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion." *Schneider,* 308 U.S. at 1611, 60 S. Ct. at 151, 84 L. Ed. at 165. Following the instructive advice of *Schneider,* this [**22] court "should be astute to examine the effect of challenged legislation" in each case in which legislative abridgment of the fundamental personal rights and liberties of freedom of speech and freedom of the press is asserted.

> Mere legislative preferences or beliefs respecting matters of public convenience may * * * be insufficient to justify [regulation which] diminishes the exercise of rights so vital to the maintenance of democratic institutions. And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights.

Schneider, 308 U.S. at 161, 60 S. Ct. at 151, 84 L. Ed. at 165.

In *Schneider,* the distributors of literature on a public street had been convicted by the city for littering. The *Schneider* court's analysis revealed the facts to indicate that although the distributors were convicted of littering, it was actually the persons receiving the literature who were throwing it down on the streets. Under these facts, the Court explained that "any [**23] burden imposed upon the [*601] city authorities in cleaning and caring for the streets as an *indirect* consequence of such distribution results from the constitutional protection of the freedom of speech and press." Schneider, 308 U.S. at 162, 60 S. Ct. at 151, 84 L. Ed. at 165. (Emphasis added). But, the Court observed that such constitutional protection does not deprive a city of all power to prevent street littering and among the obvious methods of preventing littering is to punish those who actually throw papers on the street. *Id.*

In significant contrast to the facts of *Schneider,* an ordinance which punished a citizen who merely handed a leaflet to a passing pedestrian who in turn threw the leaflet on the ground, the facts of the case before us present an ordinance which punished a citizen who was found at trial to have

actually thrown papers on "driveways, yards, sidewalks, a window well, the street, and a snow bank." Thus, in my view, this ordinance falls within that class of those "obvious methods of preventing littering" which the Court expressly referred to as passing constitutional muster, namely, an ordinance [**24] which punishes those who actually throw papers on the ground. Clearly, the Laramie ordinance does not punish the citizen who merely hands the paper to a passing pedestrian; instead, it has punished only that citizen who has thrown the paper on a driveway, yard, sidewalk, the street, or snow bank, or into a window well. Under the facts of this case, Mr. Miller was not punished when he threw the paper on the residence porch or doorstep. It is clear that the ordinance reasonably regulates the manner of distribution without reference to content, is serving a significant governmental interest and leaves open ample alternative channels for communication of the information. I would hold there has been no constitutional violation and affirm the convictions.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRONIC 2000 TOURING, INC., et al,

Plaintiffs,

v.

THE CITY OF AUBURN HILLS,

Defendant.

Case No. 00-73066

Honorable Patrick J. Duggan

FILED
JUL 07 2000
CLERK'S OFFICE
U.S. DISTRICT COURT
EASTERN MICHIGAN

ORDER GRANTING PRELIMINARY INJUNCTION

Upon the petition of Plaintiffs, the Court being advised in the premises, and for the reasons stated on the record, the Court hereby enjoins and restrains the City of Auburn Hills, its agents, servants and employees, and those acting in concert with it, including the Palace of Auburn Hills, from interfering with the live production and performance of the video accompanying the "Up in Smoke" concert at the Palace of Auburn Hills on July 7, 2000. This order does not preclude Defendants from undertaking normal security functions.

SO ORDERED.

Nancy G. Edmunds
U.S. District Judge

Nancy G. Edmunds
Acting in the absence of
Judge Duggan

Dated: JUL 07 2000

A TRUE COPY
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
BY Carol A [signature]
DEPUTY CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CHRONIC 2001 TOURING, INC., and ANDRE YOUNG a/k/a Dr. Dre,

Plaintiffs,

v.

**CIVIL ACTION NO. 00-73066**

CITY OF AUBURN HILLS, a municipal corporation,

Defendant.
________________________________________/

**MOTION FOR PRELIMINARY INJUNCTION**
**BEFORE THE HONORABLE NANCY G. EDMUNDS**
United States District Judge
226 Theodore Levin U.S. Courthouse
231 Lafayette Boulevard West
Detroit, Michigan
**JULY 7, 2000**

**APPEARANCES:**

**MR. HERSCHEL P. FINK, ESQ.,**
**MS. CYNTHIA G. THOMAS, ESQ.**
**MR. LAWRENCE J. MURPHY, ESQ.**

In behalf of Plaintiffs.

**MR. THOMAS ALLEN, ESQ.,**

In behalf of Defendant.

\- - -

*Suzanne Jacques, Official Court Reporter*
*Phone: (313)965-1338*

# I N D E X

| Proceeding | Page |
|---|---|
| Motion for Temporary Restraining Order | |
| Argument by Mr. Fink | 4 |
| Response by Mr. Allen | 10 |
| Response by Ms. Artinian | 17 |

# E X H I B I T S

| Exhibit No. | Offered | Received |
|---|---|---|

Detroit, Michigan

July 7, 2000

4:40 p.m.

- - -

THE LAW CLERK: Court calls case number 00-73066.

THE COURT: This is Chronic 2001 Touring, Inc., and Andre Young, a/k/a Dr. Dre, versus City of Auburn Hills.

Mr. Fink, I know you're representing the plaintiff. Is it Mr. Allen?

MR. ALLEN: That's correct, Your Honor, Thomas Allen representing the defendant.

THE COURT: And your client isn't here yet?

MR. ALLEN: They're on their way.

THE COURT: All right. I'm going to go forward with this. I talked to you about an hour ago, and that should be enough time for them to get here. I'll make sure they know what their responsibilities are, depending on how I rule.

I also had a call from somebody representing another interested party, the promotor. I don't know if it was the Palace of Auburn Hills or somebody else, but I told them we were going to go forward. Somebody at Dykema Gossett.

MR. FINK: News to me, Your Honor. Herschel Fink. I am told that I represent the promotor as well as the talent.

THE COURT: Well, I think maybe this was the Palace.

MR. FINK: It could be, but I haven't heard.

THE COURT: Not the actual promotor. In any event, go ahead.

MR. FINK: Thank you, Your Honor. If I may, I brought two of my colleagues with me who have been involved in this case. I need some help on some of the questions you may have. Larry Murphy, one of my partners who was involved yesterday with the controversy in the City of Detroit and was at the show last night, and Cynthia Thomas, who prepared the brief that you have, in rather short order, and is very familiar with the legal issues.

And Ms. Thomas asked me to specifically mention to please excuse the casual attire. This is the risk of the so-called casual days that law firms have. Sometimes there are emergencies.

Your Honor, I'll be brief. What we're dealing with here is a classic prior restraint. It's a restraint on speech and on protected expression, and it comes to this court, as the United States Supreme Court has said, with a heavy presumption against its validity, and indeed, the

onus is upon the city to justify such an extraordinary relief.

In talking to Mr. Allen before, he said to me, well, this isn't a prior restraint, we intend to let the show go on, but if we see that they violate the law, we'll stop the show and shut it down. I said, well, gosh, that meets my definition of a prior restraint. So I think maybe the city doesn't understand what the constitution requires.

The content of this show and the video that apparently is shown in the course of it is really not at issue. If the city finds something that they believe violates the law, it's obscene, I'm told there isn't any obscene content in the sense of pornography. It's violent. I don't know that there's a law against violence, but if they find that there's some violation of law, then the appropriate way to deal with it is to ticket, to go into court on Monday and get a complaint against the promoters and Dr. Dre, I don't know where his PhD is from, but I'm sure these folks are answerable.

There's no question about being able to pursue a criminal case if there is one, and we'll meet that, but the essence of a prior restraint, the essence of the First Amendment is the right to be free of prior restraints. There could be punishment after the fact if the law is violated, but the show must go on.

Now --

THE COURT: Well, let's focus just momentarily on the only plausible argument that they might have here, and that this is an incitement to violence and therefore runs afoul of the --

MR. FINK: Brandenburg.

THE COURT: -- Brandenburg exception.

MR. FINK: Well, they haven't seen the video. What I understand, Your Honor, and Mr. Allen may be able to address this, is that police officers in the City of Auburn Hills came to the Palace this morning, said they had been contacted by the City of Detroit police, and that they were told there was, there could be problems, and, and that Auburn Hills then demanded that this video not be shown, as happened last night in Detroit.

There was a good reason why the talent, the artist in this case decided not to perform the video, and that was that the police in Detroit, including the mayor's representative, Greg Bowens, the mayor's press secretary who was present at Joe Lewis, threatened to actually stop the show in mid show, pull the plug, turn on the lights at Joe Louis Arena with like 10,000 kids, well, not kids, but persons, some of whom would be young adults, and Dr. Dre did not want to take the risk of what the reaction might be to the police action, and he decided voluntarily to pull

it.

But we aren't even close to a Brandenburg situation. This is shown in 12 venues with the video. There's never been a problem. It's shown in major cities, it's shown in smaller cities. There's never been a problem.

The Brandenburg test, as the court may know, and as our brief spells out, requires imminent incitement. It's a very difficult test. In fact, even the showing of violence, violence that might be inspired, and I'm not conceding that it would, but violence that could conceivably be inspired is not covered. It has to be an imminent incitement that something they said, something is shown, something is done that calls for immediate action of violence, immediate violence. It's not even enough to say I want you tomorrow to go out and shoot a police officer. I should quickly add there's nothing to do with shooting police officers in this video, but something where someone says tomorrow you should do something is not, does not fall within Brandenburg.

This isn't a close case. It doesn't come anywhere near the Brandenburg test. We've just been briefing that in doing a brief for Warner Brothers in the Jenny Jones case, which if you may recall was the shooting of Mr. Amador in the Jenny Jones case, so we just looked at

the Brandenburg test which is part of the argument we're making to the Court of Appeals. But it doesn't come close, and I'm interested in how the city would justify that this meets the Brandenburg test.

But you're exactly right, Your Honor, that's the only possible argument that could be made here would be make a convincing showing to you that there is, in this show, imminent incitement to violence, that, but for police action, would happen, and there can't be a showing of that. There isn't anything close to it.

Now, if I may, and I don't want to beat a dead horse, but there is no difference here. This show is protected expression. It is no different -- I was just saying to Emery King from Channel 4, who was here a little while ago, it's no different if you have a graphic piece of video showing a security -- let's say, that you get from a security camera, or something like that, and the police come into your news room and say give us that tape, or if you put that tape on we're going to walk onto your set and we're going to arrest Carmen Harlen. It's the same thing if the police walk into HBO and say if you're going to show the Sopranos episode that shows Tony offing some mystery man, we're going to arrest everybody and pull the plug on the show. It's no different if the Free Press is going to publish some account of a violent crime that might cause

rioting in the mind of the police.

THE COURT: Is there any even arguable difference in the news piece, in the prior restraint context, between a piece of news reporting and a piece of entertainment?

MR. FINK: No.

THE COURT: And what do you rely on for that?

MR. FINK: I've given the court a couple of authorities dealing with motion pictures, violent motion pictures.

THE COURT: Boyz 'n the Hood.

MR. FINK: The Boyz 'n the Hood case is one.

THE COURT: The Warriors.

MR. FINK: The Warriors was the other.

But the courts make no distinction, Your Honor, in First Amendment area between entertainment, it's protected expression, and news, and I know of no case -- I would represent to the Court that I know of no case that has made such a distinction and found that a prior restraint is okay against entertainment, but not against news. It's the same principle.

The Blue Oval case that you had, Your Honor, is not exactly breaking news, but I think that maybe that's a little closer to our situation, but that was not anymore protected than Dr. Dre's video or a news piece. I think

the same principle applies.

THE COURT: All right. Let me hear from Mr. Allen.

MR. FINK: Oh, I'm sorry, I believe that there was a Sixth Circuit case that's in our brief. It was Judge Hackett's case involving a talk show that -- can you help me? I know it's in our brief. It's the King --

MS. THOMAS: King World.

MR. FINK: King World case which is a Sixth Circuit case where Judge Hackett was reversed by the Sixth Circuit on a prior restraint, and I believe it was a talk show. Same principle, I believe, Your Honor.

THE COURT: Okay. Thank you.

MR. FINK: Thank you. And we appreciate Your Honor hearing us on such short notice, but the show is close to starting, in less than two hours.

MR. ALLEN: Three hours.

THE COURT: Mr. Allen.

MR. ALLEN: Yes, Your Honor, Thomas Allen on behalf of defendants.

THE COURT: I see that your clients are here now.

MR. ALLEN: They are here, and as I told you, it would take some time to get from Auburn Hills to get down here.

THE COURT: I understand.

MR. ALLEN: First of all, in bringing this, filing this complaint and bringing this motion, the plaintiffs are making a couple of assumptions and assertions to the court which aren't correct.

First of all, contrary to what they claimed in their pleadings, the defendant never demanded that the video not air, and threaten to arrest if it did air. That's not the fact situation we're dealing with here.

And the other point is that our main concern was not so much the violence that is clearly, we think, depicted in here, based on what we're told, but also the pornography and nudity that's in the videotape.

And another point I'd like to bring out --

THE COURT: What makes you think there's any pornography and nudity here?

MR. ALLEN: Well, we've been told.

THE COURT: Have you seen it?

MR. ALLEN: No, and it's a very good question to ask, and the answer I think is telling to what we're here for.

We asked twice earlier today to see the video, asked them to let us see it, and see if maybe there's nothing that violates our ordinance in here. They didn't allow us to do that. We said we'd like to see it, and if

we think there's something that violates our ordinance then we can edit the parts, and the show can go on uninterrupted.

THE COURT: What makes you think you could edit the video?

MR. ALLEN: Well, we're trying to work with them in order to avoid a prior restraint, as they are. More importantly, from the point of the city, of tax payers of the City of Auburn Hills, to try to avoid a violation of our order.

The city has a constitutional obligation to enforce its laws and also to prevent the violation of its laws. We had information that this video would violate the ordinance, and we're not here to challenge that ordinance. They don't question the ordinance. That ordinance clearly covers speech and conduct which is not protected.

THE COURT: That's not the way you -- you can't impose a prior restraint.

MR. ALLEN: We weren't trying to impose --

THE COURT: Excuse me. You can't look at something and decide ahead of time whether it can be published or not published. You're not permitted to do that anymore than a newspaper can be censured ahead of time. Since when can a government agency look at a newspaper or any medium of expression and decide whether or

not the content of an article or a TV show or anything else meets the standard that they think is appropriate? Isn't that classic censorship and prior restraint?

MR. ALLEN: No.

THE COURT: Yes.

MR. ALLEN: No, I don't agree at all. The issue, as I said before, is not the validity or the constitutionality of our ordinance. They don't challenge that at all. The ordinance which has been around since 1981 governs or regulates speech or conduct which is not protected.

THE COURT: Mr. Allen, Mr. Allen, can you give me any authority whatsoever which gives any governmental entity the right to prescreen, certainly not news, or whether it's television news or written news, and/or even any entertainment venue? I mean, what gives the government entity a right to impose that kind of censorship, in the United States I'm talking about?

MR. ALLEN: Well, it's only censorship if the speech or the conduct is protected, which we don't believe in this case it is.

I think a better question, and I'll answer your inquiry, but a better question is why would they not work with us in letting us at least look at it? We could be arguing over nothing. But they refused to at least let us

see the tape to try to work with them.

And I also appreciate, in a cynical way, counsel using representations, statements I allegedly made to him to try to negotiate as part of his argument. What this problem is all about is a big publicity stunt to try to attract more attention to the tour.

What's more important from my client's point of view is that the point you touched upon earlier is a good one. This isn't news. This isn't anything but pure profit-driven entertainment, and if you look at the standards for issuing the type of injunctive relief that they ask for, I don't think they can satisfy any of them.

THE COURT: Well, do you have any case that suggests that there's any distinction between news reporting and any other kind of speech? I mean, when the KKK --

MR. ALLEN: I got --

THE COURT: Excuse me.

When the KKK gives a speech inciting people to racial bigotry, that's not news either. That's just propaganda.

MR. ALLEN: Well --

THE COURT: But it's not -- there aren't prior restraints issued against that kind of speech, at least none that I'm aware of.

MR. ALLEN: Okay. To the KKK, they probably don't look at that as propaganda, and they're also not doing it to make money. They're not charging fees or selling tickets. There's a big difference, I think, and that type of political speech clearly deserves much more scrutiny and attention and protection, but you're not talking about that here. What we're talking about is a trailer, a video trailer to start off a musical performance.

The standard, the elements that they cite that don't even attempt to address, the first one is whether there's a strong or substantial likelihood of success on the merits. Well, the merits in this case are whether or not our ordinance, assuming that there's something in this tape that violates it, is unenforceable or unconstitutional. They've not even addressed that issue. They don't even argue that.

The next standard is whether the movant will suffer irreparable harm. How in the world can these promoters and these musicians suffer any irreparable harm or any real harm if we are allowed to enforce our ordinance, if this tape happens to violate part of it? This isn't political speech. This is entertainment.

The tickets have already been sold. As counsel indicates, the show is supposed to start in a few hours.

Nobody is going to all of a sudden demand a refund or walk away without buying a tape because this tape, if it happens to violate our ordinance, is not allowed to be shown in whole or in part. So there's no harm.

The next element of the standard that has to be met by the movant is whether the issuance of the restraining order would cause substantial harm to others. Well, I don't think they can come close on that. The others in this case would be the kids, the minors, the other people in the audience, and the citizens of Auburn Hills who have this ordinance and expect it to be enforced.

The last element is whether the public interest would be served by issuing the order of restraint. What public interest here? This isn't political speech. This is pure entertainment.

And back to the main point, we aren't saying -- we never said the approach, contrary to what they premise this whole thing on, that you can't show any of this tape. All we're saying is that we have an ordinance, the ordinance is enforceable, there's no question about that, and we want to be able to have the right to be able to enforce it. And if we're at that show tonight and they show that videotape and we determine, as is our province in enforcing the laws of our jurisdiction, that that tape or any other part of the show for that matter, or anything

else that goes on that night violates our ordinances, then we're going to enforce our ordinance. And I don't see how -- the relief they seek doesn't even address what the real issue is.

THE COURT: All right. Thank you, Mr. Allen.

MR. ALLEN: Then we should have no reason to interfere with --

THE COURT: Thank you.

MR. ALLEN: And I don't think --

THE COURT: Thank you.

Ms. Artinian.

MS. ARTINIAN: Thank you, Your Honor. Apologize that I'm here casually dressed today. Susan Artinian appearing on behalf of the Palace. I know that we're not a party here. We stand here in support of the City of Auburn Hills. You and I know well the standards for injunctive relief, and this might be one of those rare cases, Your Honor, where the public good factor takes precedence.

I don't have to tell you that there's no irreparable harm that would be imposed by the court denying their request, but we are here in support of the city. We would ask the court to allow the mutual viewing of the proposed videos. As the court is well aware, tickets were sold without any attention being paid to the age of the

purchasers, and we have children that the city and the Palace would like to protect. Thank you very much.

THE COURT: All right. Everyone seems to agree on what the standards for preliminary injunction are. Although this came to me as kind of a last minute -- not kind of a last minute, a very last minute injunctive hearing, really more in the nature of a TRO, I think it's appropriate to talk about the standards for preliminary injunction; whether the movant has shown a strong or substantial likelihood of success on the merits, whether the movant has demonstrated irreparable injury, whether the issuance of a preliminary injunction would cause substantial harm to others, and whether the public interest is served by the issuance of an injunction.

I think there is no way around focusing here on the first element as the controlling element in this matter, whether the movant has shown a strong or substantial likelihood of success on the merits.

This is, without question, an issue of prior restraint, and I am very familiar with the law of prior restraints, having recently dealt with that issue in the case of Ford Motor Company versus Lane, in which this court refused to enjoin the defendant from posting Ford's trade secrets on defendant's web site.

There is no question but that the refusal to

issue prior restraints -- to sanction prior restraints is the bedrock upon which the First Amendment rests. The publication, in the absence of prior restraint, has been held to trump security interests of the United States, in the Pentagon Papers case, interests of national security; issues of fair trial, and criminal -- the rights of the criminal defendant in Nebraska Press Association versus Stewart; to trump the right to protect one's business reputation in In re King World Productions, in which a prior restraint was reversed, and the Sixth Circuit has written a comprehensive and scathing indictment of prior restraints in Proctor and Gamble Company versus Banker's Trust, 78 F3d 219.

I am not aware of any case which distinguishes between the prior restraint issued against a news story and an entertainment interest, or entertainment story. I looked, I couldn't find any, and in researching the issue for the Ford case, I couldn't find any either. That is, whether or not the person is a journalist as opposed to an entertainer doesn't seem to have ever been made an issue in the law.

I think the heart of this matter is whether there is any basis for censoring this videotape on the basis that it is not protected speech, and the only possible basis on which it could not be protected speech is

if it violates the sanction of Brandenburg versus Ohio. That's 395 U.S. 444. Brandenburg is the case in which the Supreme Court held that violent speech uses its protection that the speech is directed to inciting or producing imminent lawless action and is likely to initiate or produce such action.

That's a 1969 case, and that was elaborated upon in Hess versus Indiana, 414 U.S. 105, a 1993 case in which the court clarified that the speech could not be punished by the state on the ground that it had a tendency to lead to violence unless it was clear that the speech was intended to produce and likely to produce imminent disorder.

A more important United States Supreme Court case is Texas versus Johnson, a 1989 case which held that even speech to which a listener is likely to take serious offense is not actionable unless Brandenburg's intent and imminent incitement test is met.

In the most recent Sixth Circuit pronouncement, Michigan Protection and Advocacy Services versus Babin, affirmed by the Sixth Circuit at 18 F.3d 337 in 1991, the court held that under Brandenburg it is not enough to allege that speech is intended to incite and encourage violation of the law because only speech that robs the listener of rational thought by demanding immediate action

may be punished.

I believe that this case does not fall within the Brandenburg exception to protected speech. That exception is narrowly limited to exceptional situations where a speaker directly and unequivocally urges listeners to commit immediate violence or other imminent unlawful action under circumstances where such resultant imminent violence is likely because there is no time for rational reflection on the part of listeners, and no time for the government to take steps to keep the peace. Absent such rare, exigent circumstances, the responsibility and only right of government is to punish those who would commit criminal acts, not the speaker whose words allegedly inspired them.

In the specific context of an entertainment venue, I think it's important to look at Lewis versus Columbia Pictures Industries, a California case reported at 23 Media Law Reporter 1052 in which the court held that the promotion trailer for the movie Boyz 'n the Hood was protected by the First Amendment since speech directed to action at some indefinite time in the future is not imminent action; also, to Yacubowicz versus Paramount Pictures Corporation, 536 N.E.2d 1067, a Massachusetts case holding that the First Amendment protects the gang film The Warriors because the film does not constitute imminent

incitement, even if rife with violent scenes.

I accept the plaintiff's representation that this video has been shown at other locations on a number of different occasions without incident. Certainly, the City of Auburn Hills is entitled to have and should have security people present during this concert able to deal with any disruption that might occur, should such disruption occur, but a prior restraint is not appropriate.

It's nothing but, it's nothing but the most blatant violation of the First Amendment, and it is clear that the plaintiffs prevail on whether they have shown a strong or substantial likelihood of success on the merits.

The other factors, I don't believe they've made a particularly strong showing on. I don't believe there's irreparable injury, except to the extent that the First Amendment is a bedrock constitutional right, and to the extent that we permit incursions into the First Amendment in this instance, every erosion is a step in the wrong direction.

This is a free speech issue, and there is nothing to establish that this speech is not protected speech, so I don't believe that Eminem and Dr. Dre and the other, or Chronic 2001 Touring, Inc. is likely to suffer irreparable financial harm, but I believe the constitutional issue here is an inviolable and

irreparable -- that's not the right word, an inviolable principle, and that erosion of those principles does, in a very fundamental democratic sense, cause irreparable harm.

And that analysis would hold with respect to the third and fourth factors, as well. The harm that I'm looking at is not the immediate harm to the promoters of the concert. I'm not particularly concerned about their financial well being here. What I am concerned about is that we not permit censorships and prior restraint in the absence of some showing, and certainly, this video having been shown a number of times in the past without incident, would contradict any such showing that this is not protected speech.

So I'm issuing a preliminary injunction against the, any prior restraint with respect to this, to the showing of this video. I am ordering the City of Auburn Hills and the Palace, to the extent that they've made an appearance here, to permit this video to go forward and not to interfere with the production of this video in any way. Any security or law enforcement measures that need to be taken should be taken against any concert participant who sees fit to behave in an inappropriate manner, not against the production of the video.

MR. ALLEN: Your Honor, you're not ruling that the content of the video is protected speech, you're just

ruling that we can't enforce our ordinance should we deem it to be violated, until after the showing of the video?

THE COURT: I'm telling you that you can't sensor or restrain the showing of this video in any way. Do you understand that?

MR. ALLEN: Right.

THE COURT: Okay. Everyone from Auburn Hills understand that?

UNIDENTIFIED SPEAKER: Yes.

MR. ALLEN: A question. Your ruling did not address our main objection which was purely the obscene --

THE COURT: There's nothing that I have heard or seen that suggests that there is anything obscene. Do you have any knowledge to the contrary, anyone who has seen it, who has told you that there's pornography or obscene material in it?

MR. ALLEN: Yes.

THE COURT: Yes what?

MR. ALLEN: The City of Detroit Police Department.

THE COURT: They didn't see it.

MR. ALLEN: Yes, they did.

THE COURT: They did not.

MR. ALLEN: At least I was informed by the City of Detroit that they have seen it, and they informed

us of that, and our objection was never about the violence, which is what this whole thing seems to be about, so it doesn't really apply to our attempts to enforce the ordinance.

THE COURT: Well, nudity is not pornography. If it is, then anybody who watches HBO on a Sunday night at 9:00 is watching it also.

MR. ALLEN: Again, no one has addressed the substance of the ordinance, and I'm sure the ordinance would be upheld in light of the Supreme Court decision in the very recent --

THE COURT: I'm talking about a prior restraint and censorships, and you can't interfere with the showing of this video.

MR. ALLEN: Okay.

THE COURT: Is that clear?

MR. ALLEN: Because of the Brandenburg ruling -- I understand, but I just don't think anyone has ever addressed our main concern about this video.

THE COURT: Well, first of all, you haven't seen it. Mr. Fink, is there anything pornographic in this video?

MR. FINK: Well, my understanding is that there are a couple of nudity scenes. I believe -- I was told, and I haven't seen this, Your Honor, two naked women,

I believe, but our brief also addresses the issue of pornog -- quote, unquote, pornography.

Again, hopefully, I would have said the city knows how, but now I'm not so sure, but we'll hope that the city knows what to charge and how to charge, and we'll deal with that at a future time. But Mr. Allen's threat to me, or statement to me -- it wasn't Mr. Allen's threat, but it was that the city intended to stop the show if it saw a violation of the law, and that's what we're here about. If he thinks he's got a violation of his ordinance, I'll meet him in another court and we'll deal with that, but he can't stop the performance, and that's what Your Honor has held.

THE COURT: That's correct, and with respect to the issue of pornography, that has been held just as invalid as the Brandenburg rationale with respect to prior restraints in City of Cadillac versus Cadillac News & Video, 221 Michigan Appeals 645; Fort Wayne Books, Incorporated versus Indiana, 489 U.S. 46.

And, as I said, a couple of instances of nude women in a concert video is hardly pornographic. I mean, it may not be -- it may not be the most appealing picture for a young person to see, but it's there to see on any cable TV station and prime time for anyone who has a TV set, so --

MR. ALLEN: Right, but that's in the context

of someone's home, and the point on this --

THE COURT: I've ruled, Mr. Allen.

MR. ALLEN: There's going to be women and children --

THE COURT: You are not, you are not going to stop this video. You are not going to stop it.

MR. ALLEN: And if --

THE COURT: And if you don't understand that, you know, we'll stay here until you do.

MR. ALLEN: I just -- that's what I'm trying to do, because we have the clients here at your request, and they're going to hear everything real time, so we can't stop this video regardless of its content, and if we find something violative about it in terms of our city ordinances, our remedy is to charge the perpetrators after the fact?

THE COURT: That's correct.

MR. ALLEN: The cat will be out of the bag, so to speak.

THE COURT: That's correct.

MR. ALLEN: But in terms of our other ordinances, we're entitled to enforce those, aren't we?

THE COURT: Well, I don't know what ordinances you have in mind. If they involve prior restraint, then I'd have to say no.

MR. ALLEN: I'm talking about a lot of other different things.

THE COURT: Well, what are you talking about?

MR. ALLEN: People get violent in the crowd.

THE COURT: Well, obviously, you have the right and obligation to keep order within the crowd if people are getting violent.

MR. ALLEN: Okay. I just want to make sure we all understand --

(Mr. Allen has brief discussion off the record with client.)

MR. ALLEN: The question was what if we have to stop the show to keep order, but that would be a completely different --

THE COURT: You do not stop the show to keep order. You do not stop the show.

MR. ALLEN: Under no circumstances?

THE COURT: I cannot imagine any circumstance in which you would stop the show.

MR. ALLEN: What if a riot breaks out? It's been known to happen.

THE COURT: Well, then, you address the rioters, not the speakers.

MR. ALLEN: And if in the determination of the police they feel the best way to address the riot would be

to stop the performance?

THE COURT: I'm not going to try to second guess this. I have already ruled that you may not restrain the showing of this video. Use whatever judgment you need to use to enforce order at this concert, but if it's a matter of prior restraint, then you're going to be in contempt of this order.

MR. ALLEN: And would the order be reduced to writing?

THE COURT: For the reasons stated on the record.

MR. ALLEN: Okay.

MR. FINK: Your Honor, I did give your clerk a proposed order. I don't know if it was given to you.

MR. ALLEN: I would object.

THE COURT: He did, but that's kind of a broad statement, and I think I've made myself as clear as I can make myself.

MR. FINK: Oh, you definitely have, but I'm just wondering in light of the going on and on whether we might not have some kind of an order.

THE COURT: I'll try and get something out in writing in the next half hour or so.

MR. FINK: Thank you, Your Honor, appreciate it.

30

7/7/00 - Motion for Preliminary Injunction

(Proceedings concluded 5:15 p.m.)

Chronic 2001, et al, v. City of Auburn Hills 00-CV-73066

31

*7/7/00 - Motion for Preliminary Injunction*

**CERTIFICATE OF COURT REPORTER**

I certify that the foregoing is a correct transcript from reported proceedings in the above-entitled matter.

**SUZANNE JACQUES, CSR, RMR**
Official Court Reporter
Eastern District of Michigan

7-10-00
Date

*Chronic 2001, et al, v. City of Auburn Hills 00-CV-73066*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDRE YOUNG a/k/a DR. DRE, an individual California resident, and CHRONIC 2001 TOURING, INC., a California corporation,

Plaintiffs,

vs.

THE CITY OF DETROIT, a Michigan municipal corporation, GREG BOWENS, GARY BROWN and MARVIN WINKLER, in their individual capacities,

Defendants.

00-40266

Case No.

Hon.

PAUL V. GADOLA

*HONIGMAN MILLER SCHWARTZ AND COHN*
Attorneys for Plaintiffs
By: Herschel P. Fink (P13427)
Cynthia G. Thomas (P43501)
Lawrence J. Murphy (P47129)
2290 First National Building
Detroit, Michigan 48226
Phone: (313) 465-7400

*KING, PURTICH, HOLMES, PATERNO & BERLINER, LLP*
Co-Counsel for Plaintiffs
By: Howard E. King
900 Avenue of the Stars
Twenty-Fifth Floor
Los Angeles, CA 90067
Phone: (310) 282-8989

# COMPLAINT

Plaintiffs Andre Young a/k/a Dr. Dre and Chronic 2001 Touring, Inc. ("Plaintiffs"), by their attorneys Honigman Miller Schwartz and Cohn, for their Complaint against Defendants, state:

**JURISDICTION, VENUE, PARTIES**

1. This is an action to redress the deprivation by the Defendants of rights secured to the Plaintiffs by the Constitution and laws of the United States.

2. Plaintiff Andre Young a/k/a Dr. Dre ("Dr. Dre") is an individual who resides in the State of California.

3. Plaintiff Chronic 2001 Touring, Inc. is a California corporation with its principal place of business in Los Angeles, California.

4. Defendant The City of Detroit ("the City") is a Michigan municipal corporation located in Detroit, Michigan, Wayne County.

5. Defendant Greg Bowens ("Bowens") is a top aide to and the press secretary to the Mayor of the City of Detroit, and is an individual who resides in Detroit, Michigan. During all times mentioned in the Complaint, Bowens was acting in his official capacity. He is sued, however, only in individual capacity.

6. Defendant Gary Brown ("Brown") holds the rank of Commander with the Detroit Police Department, and is an individual who resides in Detroit, Michigan. During all times mentioned in the Complaint, Brown was acting in his official capacity. He is sued, however, only in his individual capacity.

7. Defendant Marvin Winkler ("Winkler") is the Assistant Chief of Police with the Detroit Police Department and is an individual who resides in Detroit, Michigan. During all times mentioned, Winkler was acting in his official capacity. He is sued, however, only in his individual capacity.

8. This action arises under the First Amendment to the United States Constitution and the civil rights laws of the United States, 42 U.S.C. § 1983.

9. Jurisdiction of this court is invoked under the provisions of Sections 1331, 1343(3) and 1367(a) of Title 28 of the United States Code and §§ 1983 and 1988 of Title 42 of the United States Code.

10. Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because Defendant is a municipal corporation located in this District.

**GENERAL ALLEGATIONS**

11. Plaintiffs incorporate paragraphs 1 through 10, above.

12. At all relevant times, Plaintiffs have been engaged in the production and performance of a major national concert tour known as "The Up In Smoke Tour" ("the Tour"). The Tour consists of the performances of several top rap music artists, including Dr. Dre, Snoop Dogg, and Ice Cube.

13. The performances, including the music performed, the non-musical performances and the exhibition of film or video as a part of the performances, clearly constitute expressive activity protected by the First Amendment to the United States

Constitution.

    14.    On the evening of Thursday, July 6, 2000, the Tour held a scheduled performance at the Joe Louis Arena in Detroit, Michigan ("Arena"). The Tour had played in ten cities across the United States as well as in Toronto, Ontario without incident before coming to Detroit.

    15.    The performance included a short movie approximately eight minutes in length ("The Video"), which is an integral part of Plaintiffs' performance, and was designed and created to be the introduction leading into the Tour's headline joint performance by Dr. Dre and Snoop Dogg. The Video clearly constitutes expression protected by the First Amendment to the United States Constitution.

    16.    Late in the afternoon of Thursday, July 6, 2000, an agent of the City appeared at the Arena and demanded to review the video in her official capacity as an agent of the City.

    17.    Just hours before the performance, at approximately 5:00 p.m., the City, by the Defendants and others, accompanied by a significant number of armed members of the Detroit Police Department (both uniformed and plainclothes), appeared at the Arena and demanded that a video allegedly containing nudity and/or violence (the "Video") not be played during the performance.

    18.    Bowens, a close aide to and the press secretary to Dennis W. Archer, the Mayor of the City of Detroit (the "Mayor"), represented to Tour personnel and

representatives that he was acting with full knowledge and authority of the Mayor. Bowens demanded that the Video not be played during the performance under penalty of arrest.  Bowens stated that the Video "wasn't appropriate" for the City and that showing the Video would violate "state laws."  However, when William Silva ("Silva"), a promoter for the Tour, pressed for citations to these alleged laws, Bowens bluntly replied:  "You don't get it, this is my motherfucking city and you're going to do it [the performance] my motherfucking way."  Bowens added: "Dr. Dre was arrested last time he toured here [in Detroit], so he'll know we're serious."

19.   Some time thereafter, an as-yet-unidentified female agent of the City accompanying Bowens, stated that showing the Video would allegedly violate "M.C.L. 750.145 [contributing to the neglect or delinquency of children] and M.C.L. 750.143 [exhibition of obscene material in view of children]."

20.   Neither the City, the Police Department nor the Defendants had any court order to support their position that these statutes had any application to showing the Video inside the Arena or that they had any authority to demand the Video not be played upon threat of arrest.

21.   The actions of Defendants were clearly an unlawful prior restraint of expression and a violation of Plaintiffs' rights under the First Amendment and the Fourteenth Amendment of the United States Constitution.

22.   Commander Gary Brown of the Detroit Police Department, who